GRIFFIN, C.J.
Appellant, Jim Walters Homes, Inc. [“JWH”], appeals a judgment rendered against it and in favor of the Estate of Richard Walker in a wrongful death case after a jury trial. On appeal, JWH asserts three errors were made below: entry of a partial summary judgment that, at the place and time of the incident in question, JWH had a duty to maintain the site of the accident in a safe condition; the refusal of the lower court to allow the assertion of the workers’ compensation immunity defense shortly before trial; and, finally, the submission to the jury of a second, special verdict form on damages after review of the first verdict form indicated there might be an error in the jurors’ reduction to present value. As to the latter, we find no error. As to the second, we conclude that the trial court acted within the scope of its discretion under the circumstances of this case. As to the partial summary judgment, however, we are bound to agree with the appellant that the lower court erred in issuing its partial summary judgment. Accordingly, we reverse and remand for a new trial. •
The facts underlying this case, presented over seven days of trial, are involved and would require a good deal of space to chronicle fully. The following is a summary of the *433 facts in order to place the contested ruling of the trial court in perspective.
The business of JWH is to build homes to varying states of completion, depending on the specific requirements of the owner. This enables the owner to perform substantial portions of the work and use his “sweat equity” to offset the cost of construction.
In this case, JWH entered into a home construction contract with Mary Knott on August 20, 1993 [the “contract”]. The contract obligated JWH to build the shell (Phase I) and then turn the project over to Mary Knott for construction of the flooring, insulation and drywall (Phase II). After Mrs. Knott finished her-portion of the work, JWH was to return and finish minor trim work that could not be completed until the Knotts performed their portion of the work (Phase III).
JWH substantially completed its portion of the work in November 1993 and, at that point, released the home to the Knotts. From that point forward, the Knotts were in actual possession of the property and, over the ensuing eighteen months, performed their portion of the work without participation or assistance from JWH. During this time, the Knotts hired their own subcontractors to perform portions of the work and exercised control over the job site. Also during this time, JWH’s original permit expired and Mrs. Knott, without JWH’s aid or participation, renewed the permit at her expense on October 7, 1994 and again on May 26,1995. The provision of temporary electrical power to the site was the obligation, by contract, of the Knotts. Rather than pay for a temporary power pole and line, the Knotts provided temporary electrical power to the home by running extension cords from an old shed they owned on the property to the new home.
In September 1995, at the request of the Knotts, JWH called Walker Plumbing, the original plumbing subcontractor, to return to the site and complete the plumbing “trim-out” work. Richard Walker was the individual who came to the site to perform the trim-out work. The “trim-out” consisted of installing the sinks and hooking up the hot water heater and interior plumbing fixtures to the exterior water sources. This work could be performed in approximately one-half day. Completion of the trim-out work did not require Mr. Walker to go underneath the house.
On the morning of September 21, 1995, JWH’s construction supervisor, Rob Larsen, visited the home and noticed, for the first time, the extension cords which Mr. Knott had placed on the site. Mr. Larsen also noticed that the cord was clipped into the electrical panel box of the new house and he told Mr. Knott that this was a dangerous condition and that he should remove the cord.
During the same visit, Mr. Knott informed Mr. Larsen that he intended to add an ice maker to the house and asked if he would recommend a contractor to perform the work. Mr. Larsen explained that since Mr. Walker would be coming to the project site in the afternoon, Mr. Knott might be able to establish a separate arrangement with him to install the ice maker.
On the afternoon of September 21, 1995, Mr. Walker arrived to complete the plumbing trim-out work on the home. Although JWH required Walker Plumbing to have its own portable generator and to provide its own temporary electricity, Mr. Walker used the Knotts’ extension cord to power his drill while working in the kitchen and one of the bathrooms of the new house that afternoon.
That evening, after completing the trim-out work he was required to perform under the contract, Mr. Walker went underneath the house to install the ice maker as requested by Mr. Knott. While under the house and working on- the ice maker, Mr. Walker was electrocuted.. Mr. Walker was not using any electrical device at the time of his death, and Mr. Knott testified that at the time Mr. Walker was working under the house, the extension cord was lying on the ground some fifteen to twenty feet away from Mr. Walker.
At some point before Mr. Walker began to install the ice maker, Mr. Knott washed his hands at the side of the house. The plaintiffs’ experts testified that a puddle of water formed and rose to a point where it came into contact with the extension cord, the wa *434 ter became energized, and an electrical current traveled through the moist ground to Mr. Walker. The defendant’s experts testified that the electricity could not have traveled the entire distance through the ground to Mr. Walker. Instead, they maintained that if the extension cord was still clipped to the electrical panel inside the house — as Mr. Larsen noticed earlier in the day — the entire house would have been energized and metal pipes underneath the house could have acted as conduits which, if touched by Mr. Walker, would have caused his electrocution.
Shortly before the trial, the lower court conducted a hearing on a multi-faceted motion for partial summary judgment filed by the plaintiff. Important for purposes of this appeal was the plaintiffs request for a judgment on the question whether JWH had a duty to exercise reasonable care for the safety of the decedent, Richard Walker, “while at the Knott job site.” During the course of the hearing, the plaintiff urged that because Robert Larsen, the licensed contractor employed by JWH, was the contractor who pulled the permit for the construction of the home, JWH was responsible for the safety of the job site until the certificate of occupancy was issued. According to the plaintiff, because of the lack of a ground fault interrupter device on the temporary power cord used by the Knotts, the job site was indisputably not “safe.”
For its part, JWH urged that, by contract, certain portions of the work were to be undertaken by them, other portions by the owner, and that it should not be held responsible for unsafe conditions on the job site created by the owner. JWH also argued that, with the exception of minor plumbing trim being done by Walker on the date of the accident, it had completed its work in Phase I of the project some eighteen months earlier and had turned the project over to the Knotts for completion of Phase II. The expectation was that the Knotts would complete their work in ninety days, after which JWH would send someone to do the plumbing trim-out. JWH urged that it had relinquished control of the Knotts’ house under construction to the Knotts some eighteen months earlier and that merely by going out to complete the minor plumbing trim they did not recover control of the job site. Additionally, they urged that because, pursuant to their contract, any supply of temporary power was the responsibility of the homeowner, not JWH, and because JWH required all of its subcontractors to travel with their own power generators to use as needed, any responsibility for defects in the temporary power line would be the sole responsibility of the Knotts. Finally, JWH urged that because the decedent Richard Walker was an independent contractor on the job site, he alone was responsible for his safety, not JWH.
The trial court’s expressed analysis of these various legal positions was sensible and we do not disagree with it. On the one hand, the court rejected the notion that, solely by virtue of being identified on the permit as contractor, JWH was responsible for the safety of the entire premises during the entire course of construction, whether or not construction for which JWH was responsible was being performed. Because of the contractual relationship between the parties, JWH should only be responsible for the safety of the job site to the extent that the responsibilities of JWH were being carried out at the home. In essence, responsibility for job site safety rotated in accordance with the construction events taking place at the site. This distinction was important in this case because the bulk of the evidence seemed to indicate that Mr. Walker had completed his plumbing trim work for JWH and had moved on to the separate undertaking with the Knotts to install their ice maker for them. As the court explained:
... I think there is a sufficient factual dispute as to whether he was working under Jim Walter as a Jim Walter sub or whether he was working independently for the home owner. And my sense is that that may alter the responsibility that Jim Walter Homes owed to him.
The court went on to explain:
I am convinced that they [JWH] are essentially the general contractor. I am convinced they are in phase III. I am convinced there is no material dispute with regard to that. I haven’t heard any today, anyway. The dispute has to do with what *435 is the status of Mr. Walker while he’s there.... If there is a general duty to have the job site in a safe condition as the general contractor, which I buy — I buy it based on the law. I buy it based on the facts of this case. I think it’s undisputed. The question — the question then is: Is it foreseeable that this man would be doing what he was doing, in the location he was doing it, would come in contact with the electrical power ... [L]et me start again. The defendant says, Larson, I may have called in to the job site. But at a certain point, he is calling to the job site by Larson ended. And he was there solely because the home owner was requesting that he be there. That may in fact change whether he falls within that duty. It may not. But because that issue is disputed, I am uncomfortable taking away from the trier of fact the ability to say no, this was someone that Jim Walter Homes could not reasonably have expected to come into contact with that particular condition.... I’m convinced based on the contractual relationships between the parties and the case law that Jim Walter Homes had, as between Jim Walter Homes and Mrs. Knott, that it was Jim Walter Homes’ responsibility, legal responsibility to insure that the premises were in a reasonably safe condition as the general contractor. I buy that argument.
But I also buy your argument, Mr. Mc-Donough [JWH’s attorney] that there is a factual dispute as to the status of Richard Walker at the time of his death. [Emphasis added.]
We agree with this conclusion, if not necessarily the analysis in terms of foreseeability. Even though both the scope and the limitations of the trial court’s ruling appear clear to the reader, i.e. simply that “Jim Walter Homes had a duty on the date that this event occurred to maintain those premises in a reasonably safe condition ... based upon their status as the general contractor,”[1] the plaintiff pressed for the court to adopt the language “at the time and place of the incident complained of.” The court responded by simply agreeing to put the date of the accident in the partial summary judgment.
The language contained in the order subsequently signed by the court was: “the court determines as a matter of law that at the time and place of the incident alleged in the complaint, Jim Walter Homes, Inc., as general contractor, had a duty to maintain the premises in a reasonably safe condition.”
The centrality of this single sentence in the partial summary judgment for the trial strategy of the plaintiff cannot be overemphasized. The very first thing the plaintiff did after opening statements were completed was to open its case by asking the court to read the partial summary judgment to the jury. The trial court complied, over the defendant’s objection. In opening statement itself, this ruling was prominently and repeatedly referred to. It was a constant feature of the trial and was again emphasized in the plaintiffs closing argument. Indeed, at the close of the plaintiffs ease, after the court had reserved ruling on the defendant’s motion for the court to withdraw its summary judgment order in light of the evidence presented at trial, defense counsel exclaimed to the court in frustration that “they [the plaintiffs] have a tendency, on objection, to repeat the summary judgment motion again and to cause the court to have to repeat it and the jury hears it and it’s — as plaintiff pointed out, it’s hard to unring a bell that has already been rung. We prefer not to have it rung every time there is an objection.” Counsel for the plaintiff responded unrepentantly that, if the defendant made any effort to offer any testimony that they had “no control, had no responsibility,” he would ask the court to instruct the jury in accordance with the previous.rulings.
There certainly is no eiror preservation problem in this case. The defendant complained bitterly about the partial summary judgment at every available opportunity and, after the verdict, in the motion for new trial, the issue was raised again. The motion argued that “the clear evidence at trial was that a factual issue existed as to whether Jim Walter Homes was in fact the contractor at the time of the death of Richard Walker on *436 the Knott job site. Defendant was therefore entitled to have this issue submitted to the jury.” Indeed, although there does appear to be some dispute about whether he had completed all of JWH’s work, there doesn’t appear,to be any genuine dispute that at the time of his death Mr. Walker was installing an ice maker for the Knotts. In short, it never was undisputed on this record that “at the time and place of the incident in question,” Jim Walter Homes, Inc., as contractor, had a duty to maintain the premises in a reasonably safe condition. It may be true, as the trial court explained, that on the date of the incident, during the time that the contractual responsibilities of JWH to the Knotts were being carried out on the construction site, JWH had a duty to maintain the premises in a reasonably safe condition, but whether that was occurring “at the time and place of the incident in question” was an unresolved issue of fact. Thus, entry of the partial summary judgment was error.
After reviewing the record, we recognize that this case was well tried by the plaintiff and the outcome of this case on retrial may not be different. Nevertheless, because of the legal significance of the ruling on partial summary judgment and because the plaintiff made it such a prominent feature of the trial, we are unprepared to say this error was harmless.
REVERSED and REMANDED.
PETERSON, J., concurs.
THOMPSON, J., concurs in part; dissents in part, with opinion.

. Emphasis added.